McCOY v McNUTT

1. EVIDENCE—INJURIES—BEFORE AND AFTER TESTIMONY.

Before and after testimony is valid in determining physical injuries received in an accident.

2. EVIDENCE—INJURIES—LAY TESTIMONY—EXPERT TESTIMONY—PRE-EXISTING CONDITION —CAUSAL CONNECTION—FINDINGS OF FACT.

Lay testimony of a plaintiff together with experts' testimony to the effect that an accident and resulting necessary medical procedures applied to the plaintiff's upper teeth and gums could have aggravated her pre-existing periodontal condition was sufficient for a finding of fact that the loss of the upper teeth was causally connected to the accident.

3. APPEAL AND ERROR—QUESTION OF FACT—NONJURY TRIAL

The Court of Appeals will not substitute its judgment on questions of fact for that of the trial court in a nonjury case unless the evidence presented clearly preponderates in the opposite direction.

Appeal from Jackson, Gordon W. Britten, J. Submitted Division 2 December 3, 1974, at Lansing. (Docket No. 18706.) Decided January 28, 1975.

Complaint by Vernis McCoy and Carrie McCoy against George McNutt for damages for injuries received in an automobile accident. Judgment for plaintiffs. Defendant appeals. Affirmed.

REFERENCES FOR POINTS IN HEADNOTES

[1] 30 Am Jur 2d, Evidence § 1002.

Admissibility of report of public officer or employee on cause of or responsibility for injury to person or damage to property. 153 ALR 163.

[2] 30 Am Jur 2d, Evidence §§ 656, 684, 685.

[3] 5 Am Jur 2d, Appeal and Error §§ 635, 966.

*Rappleye, Bannasch & Williams* (by *William J. Addison*), for plaintiffs.

*Kelly, Kelly & Kelly,* for defendant.

Before: D. E. HOLBROOK, P. J., and R. B. BURNS and VAN VALKENBURG,[*] JJ.

D. E. HOLBROOK, P. J. This case was an automobile negligence action, wherein defendant admitted liability. It was tried before the court without a jury. Judgments in favor of plaintiffs Carrie McCoy in the amount of $20,000 and Vernis McCoy in the amount of $3600.48 against defendant George McNutt were awarded.

Defendant has appealed, asserting that the trial court erred in awarding to Carrie McCoy damages for the loss of her upper teeth, claiming that such loss was not causally connected to the accident.

We deem it advisable to relate herein a part of the trial court's opinion concerning Mrs. McCoy's injuries, *viz.:*

"The impact totaled plaintiffs' auto and Mrs. McCoy, aged 58, housewife, received the following injuries:

"She was unconscious at the scene, pale, bleeding at the mouth, with guzzling noises coming from her throat. En route to the hospital she sat up because she was choking on her blood.

"The medical examination revealed that the maxillary bone (the area of bone beneath the eyes and into which the teeth are inserted) was completely dissociated from the rest of the skull, *i.e.,* it was free-floating or attached only by muscle and facial attachments. She had a displaced fracture of the nose, fractures of the right and left zygoma (cheek bones), and a fractured clavicle. She had a one-inch laceration of the left medial canthal area and other bruises, lacerations and

---

[*] Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

contusions of a minor nature. Both eyes were closed because of severe ecchymoses.

"Five days after her admission on December 24, 1970, a surgical procedure was used wherein wires were inserted through incisions in her mouth and eyebrows and anchored to bars wired against the teeth of her upper and lower jaws.

"On February 12, 1971, these bars and wires were removed although some wires were left intact to secure fracture fragments. On February 17, the two middle teeth of the upper jaw had separated and loosened and these were wired together.

"The treating specialist noted that the gums were kept in good condition for a person having wires around her teeth.

"All of her upper teeth were loose after the accident and they did not tighten up after the wires and bars were removed. Her mouth was wired shut for seven weeks. She is presently unable to open her mouth wide enough to eat an apple or corn on the cob, according to Dr. Kornac, the treating specialist.

"In August of 1971, she was referred to Dr. Booth, D.D.S. to evaluate her upper teeth. He found she had periodontal disease and it was his conclusion that a certain amount had to be present previous to her accident. He further concluded that the bars and wires could have aggravated this disease. He removed eleven upper teeth and she had a denture made by Dr. Dixon who also made a partial lower plate for her.

"In her visit to Dr. Kornac on May 5, 1972, she complained of nasal congestion and tenderness where wires remain.

"At present we have a woman who, due to this accident, has lost her upper teeth. She has no sense of smell and consequent impaired taste. She has wires remaining in her temples and over the bridge of her nose where her glasses are supposed to rest. These areas remain sensitive and her glasses cannot be worn in a normal manner.

"Her left eye is noticeably sunken in comparison to the right eye. She had double vision for about two months but this has corrected itself. There is a pulling

sensation in this eye with pain and burning sensations. Her side vision is limited.

"She sleeps only three or four hours a night and feels tired all the time. She is nervous; she formerly liked to travel, but now she fears riding in an automobile. Her face gets cold easily and turns black and blue around the jaw-ear area if she is out in the cold. She breathes through one nostril only.

"She enjoyed good health prior to the accident.

"She had the following proved medical expenses:

| | |
|---|---:|
| "Dr. Kornac (Stageman) | $475.00 |
| "Foote Hospital | 989.08 |
| "Dr. Booth | 80.00 |
| "Dr. Oleksy | 20.00 |
| "Dr. Niekamp | 62.00 |
| "Jackson Doctors' Emergency Service | 15.00 |
| "Horne Vinson Ambulance | 45.00 |
| "King Optical | 21.72 |
| "Dixon Drug Store | 11.80 |
| TOTAL | $1,719.60 |

"She had a denture bill of $338 for upper and partial lower, but since there was no causal relationship shown between the lower teeth and the subject accident and no breakdown of charges for the different work performed, the court cannot speculate as to the amount charged for the upper denture and the entire amount must be disallowed.

"The court finds that Carrie McCoy sustained damages for past, present and future pain and suffering, disfigurement, loss of sense of smell and impairment of taste, in the sum of $20,000 plus interest."

Directly pertaining to the issue raised by defendant we restate pertinent testimony of three witnesses. Mrs. Carrie McCoy:

"*Q. [Mr. Rappleye, plaintiffs' attorney]:* Following the accident, was there any difference in your teeth?

"*A.* Oh, yes.

"*Q.* Describe that for us, please.

"*A.* They were all loose.

"*Q.* Now, do you mean on the upper and the lower, or just on the upper?

"*A.* The upper was loose, and my lower teeth were out of position.

"*Q.* And was there any pain associated with your teeth?

"*A.* Yes.

"*Q.* All right. Now, after you got home, did you still have the wires in your teeth, wiring your jaws together?

"*A.* Yes, sir, I did.

"*Q.* How long did those wires stay in place?

"*A.* About seven or eight weeks.

"*Q.* And, who took them out, do you know?

"*A.* Doctor Kornac.

\* \* \*.

"*Q.* What was the general state of your teeth, prior to the accident, Mrs. McCoy?

"*A.* Fair. I mean, I didn't have to have any others to eat with.

"*Q.* You were not receiving any dental treatment?

"*A.* Oh, no. No.

"*Q.* Prior to the accident?

"*A.* No.

"*Q.* Were you able to bite?

"*A.* Those teeth were perfect.

"*Q.* Were you able to bite things, such as apples, carrots, those things that require biting strength?

"*A.* Do you mean before?

"*Q.* Yes.

"*A.* Oh, yes.

"*Q.* Did you have any difficulty doing that before the accident?

"*A.* No, no."

Dr. Ronald W. Kornac:

"*Q.* *[Mr. Wilkins, plaintiffs' attorney]:* Doctor, as a result of examining these teeth, did you reach an

opinion as to what was the cause of this being misplaced and loose?

"*A.* Well, there's always some tendency to possible loosening of teeth when you apply arch bars. This may have been a factor in their being loose. It was not noted at the time of surgery that these teeth were particularly loose. However, it's difficult to say whether these teeth are loose when everything is moving when you touch the teeth.

\* \* \*

"*Q. [Mr. Kelly, defendant's attorney]:* Doctor, does your file or notes indicate any observation of the periodontal disease in this patient?

"*A.* No.

"*Q.* You have no reflection one way or the other on that?

"*A.* Well, number one, I'm not an expert in periodontal disease, but if you'll ask me what the condition of her gums were like, I would say that she kept her gums in reasonable condition. In fact in good condition for a person who's wearing wires around their teeth. As to previous periodontal disease, I could not—you know, I don't have an opinion one way or the other. I should say there wasn't any gross periodontal disease that was obvious to me."

## Dr. Jerry B. Booth:

"*Q. [Mr. Kelly]:* And, the reason for the extraction of the remaining eleven upper jaw teeth was their looseness? Is that correct?

"*A.* Correct.

"*Q.* And wasn't the basic cause of the looseness a preexisting periodontal disease?

"*A.* Yes, she had periodontal disease. Certainly a certain amount of this had to be preexisting prior to the accident. Periodontal disease isn't something that occurs in a matter of months.

"Having to have arch bars on these teeth with a transosseous loops *[sic]* adding a foreign body in the gum tissue I think could have potentially aggravated her periodontal situation.

"I'm not aware of the total amount of tooth blow that was involved in this initial injury either, because I didn't see her initially.

"A blow to her mouth would have had to be strong enough to break the upper jaw off the base of the cranium, certainly had to be taken by something. Now, whether it was mostly the teeth or up in the base of the nose, because the nose was indeed fractured, as conjecture, but it could be difficult to rule out the fact that the teeth didn't receive some of the blow.

"*Q.* The reason for the extraction of the teeth was their looseness?

"*A.* That's correct.

"*Q.* And the basic cause of the looseness was the periodontal decay?

"*A.* Correct.

"*Q.* There may be possibly some involvement with the traumatic blow, but the basic reason was the preexisting periodontal decay over a long period of time?

"*A.* I would say yes to that."

The lay testimony of Mrs. McCoy was to the effect that her upper teeth prior to the accident were not loose and were able to be used by her for normal eating, whereas after the accident, her teeth were very loose and she was unable to eat with them. Before and after testimony has been ruled valid in determining physical injuries received in an accident. *Konieczka v Mt Clemens Metal Products Co,* 360 Mich 500; 104 NW2d 202 (1960), *Howard v City of Melvindale,* 27 Mich App 227; 183 NW2d 341 (1970). This lay testimony together with the experts' testimony to the effect that the accident and the resulting necessary medical procedures applied to Mrs. McCoy's upper teeth and gums could have aggravated her preexisting periodontal condition, was sufficient for the trial court to rule that the loss of the upper teeth was causally connected to the accident. *Magda v*

*Johns,* 374 Mich 14, 21–22; 130 NW2d 902, 906 (1964).

This Court will not substitute its judgment on questions of fact for that of the trial court in a nonjury case, unless the evidence presented clearly preponderates in the opposite direction. *West Michigan Park Association v Department of Conservation,* 2 Mich App 254, 266–267; 139 NW2d 758, 763–764 (1966).

We rule that the evidence herein does not clearly preponderate in the opposite direction.

Affirmed. Costs to plaintiffs.